IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01256-RBJ-CBS

GARY E. MICKELSON,

        Plaintiff,

v.

J.R. PROCTOR and
*JOHN AND JANE DOE 1-100*,

        Defendants.

---

RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

---

Magistrate Judge Shaffer

      This matter comes before the court on Defendants J.R. Proctor and John and Jane Does' (collectively "Defendants") Motion for Summary Judgment (doc. #21), filed on April 4, 2014.[1] This motion was referred to the Magistrate Judge pursuant to the Order of Reference dated May 22, 2013 (doc. #4) and Memorandum dated April 7, 2014 (doc. #22). This court has carefully considered the motion and related briefing, the entire case file, the comments offered by the parties during the August 26, 2013 Preliminary Scheduling Conference, October 28, 2013 Scheduling Conference, and July 24, 2014 Status Conference, and applicable case law. For the following reasons, I recommend that the Motion for Summary Judgment be denied except as to Plaintiff's claim for conspiracy.

---

[1] Defendants originally filed a Motion to Dismiss (doc. #21), which this court converted to a Motion for Summary Judgment at the July 24, 2014 Status Conference (*see* doc. #27).

## FACTUAL ALLEGATIONS

Mr. Mickelson filed this lawsuit pursuant to 42 U.S.C. § 1983 as a *pro se* plaintiff claiming violations of his Fourth, Fifth, Eighth, Tenth, and Fourteenth Amendment rights premised on allegations of an unlawful stop and detainment, unlawful arrest, and excessive force used during the arrest. Plaintiff also claims Defendants were engaged in a conspiracy to violate his constitutional rights and that a John Doe Colorado State Patrolman is liable in his supervisory role for discouraging Plaintiff from seeking redress. Plaintiff seeks an unspecified amount of compensatory and punitive damages and costs and fees.

A 67 year old resident of Cortez, Colorado, Plaintiff visited a local bar on the night of May 18, 2012, for the purpose of exhibiting his vintage motorcycle at a car show hosted by the tavern. (*See* Plaintiff's Response to Motion to Dismiss (Doc. #24) at p. 2). Three officers with the Colorado Department of Revenue's Liquor Enforcement Division were present at the bar that night acting in conjunction with three Colorado State Patrolmen who were parked outside of the bar. (Doc. #24 at p. 68). Plaintiff named Officer J.R. Proctor as a Defendant Patrolman, and designated a second Patrolman as Defendant John Doe 1. In his Response to Defendant's Motion to Dismiss, Plaintiff identified John Doe 1 as Sergeant Matt Ozanic.[2] (Doc. #24 at p. 3). Plaintiff, however, did not seek leave of court to substitute Sergeant Ozanic as John Doe 1, with the consequence that Ozanic has not been served and is not a party to this action. *See Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("a party not properly named in the caption of a complaint may still be properly before the court if the allegations in the body of the complaint make it plain the party is intended as a defendant;" however, no court may enter judgment against parties who "were not served notice of the lawsuit and are not properly before the court.").

---

[2] The third Patrolman was also identified in Plaintiff's Response but his identity is not germane to this lawsuit.

Upon Plaintiff's leaving the bar, one of the Liquor Enforcement Officers alerted Ozanic and Proctor that a male fitting Plaintiff's description appeared intoxicated. (*See* Affidavit of Defendant Proctor (Doc. #28-1) at ¶ 3). Ozanic, who was Defendant Proctor's supervisor, instructed Proctor to follow Plaintiff in his patrol car; Ozanic then joined the tail. (Doc. #24 at p. 3). Defendant Proctor was driving behind Plaintiff as Plaintiff approached a local intersection. The vintage motorcycle that Plaintiff was driving did not have turn signal indicators, thus Plaintiff signaled by hand his intent to make a left-hand turn and stopped at the intersection before proceeding with the turn. Defendant Proctor activated his emergency lights as he followed Plaintiff through the intersection, and Plaintiff responded by slowing to a stop on the shoulder of the road. Plaintiff alleges he was aware of the law enforcement presence both within and without the tavern that night, and deliberately drove his motorcycle at or under the speed limit and observed the traffic laws after he left the bar.

Proctor stated the reason for haling Plaintiff was his failure to signal the turn. (*See* Doc. #28-1 at ¶¶ 4-5). Proctor claims that upon approaching Mickelson on foot, he noted "a moderate odor of an unknown alcoholic beverage on his breath and [that] his eyes appeared to be bloodshot and watery and his speech was slow." (Doc. #28-1 at ¶ 5). Proctor attested in his affidavit that he asked Plaintiff if he had consumed alcohol, to which "[Plaintiff] stated that he had four drinks earlier, but had stopped." *Id.* Mickelson disputes that he told Proctor he had consumed four beverages. (*See* Plaintiff's Supplemental Brief (Doc. #29) at pp. 6-7 n.2). Proctor then asked for Mickelson's driver's license, vehicle registration, and proof of insurance, during which Ozanic arrived in his patrol car. (Doc. #28-1 at ¶ 6). Proctor instructed Mickelson to perform a field sobriety test and noted before they began that Mickelson was "unsteady" on his feet, prompting him to ask if Mickelson was disabled in any way that would interfere with his

ability to perform the field sobriety test. (Doc. #28-1 at ¶ 7). Mickelson alleges he told Proctor in Ozanic's presence that his only disability was being "old and hard of hearing." (Doc. #24 at p. 4). Mickelson alleges he complied with Proctor's instruction to count backward from fifty-seven to forty-seven, but that Proctor arrested him for suspicion of driving under the influence because Proctor claimed the instruction was to count backward to forty-three.

Upon arrest, Proctor asked Mickelson to place his hands behind his back. Mickelson attempted to comply but found that his hands could not touch behind him. Mickelson alleges that Proctor then "violently jerked his left arm backward" and "pushed [his hands] together and handcuffed [him]." (First Amended Complaint (Doc. #13) at p. 4; Doc. #24 at pp. 45-46, TR:48:22-4).[3] Mickelson testified that he felt pain in his upper left back and shoulder immediately upon being handcuffed, and exclaimed, "That hurts me. Could you put [the handcuffs] in the front?" (Doc. #24 at pp. 46, 47, TR:49:1-4, 50:1-4).[4] Proctor escorted Plaintiff to the backseat of the patrol car without responding. Mickelson testified that while sitting in the car the pain escalated to the point that he began to cry. (Doc. #24 at p. 48, TR:50:8-18, TR:51:10-14). The small interior of the backseat required him to sit sideways, and he felt the sensation of a "really bad cramp" in the left side of his upper back and shoulder. (Doc. #24 at p.48, TR:51:12-22). Mickelson expressed to Proctor again that he was hurting and asked that the handcuffs be repositioned. Proctor responded that "the rules" prevented him from adjusting the handcuffs." (Doc. #24 at pp. 48-49, TR:51:23-52:4).[5] Mickelson alleges he waited in the

---

[3] Plaintiff claimed in his Amended Complaint that he notified Proctor prior to the handcuffing that he could not grasp his hands together behind his back (*see* Doc. #13 at p. 4); but Plaintiff's deposition testimony indicates that he did not warn Proctor of his physical limitation. (*See* Doc. #24 at p. 46, TR:5-25).

[4] Mickelson recalled at his deposition that the pain equaled "[m]aybe a 4 or 5" on a scale of 1 to 10. (Doc. #24 at p. 48, TR:51:3-7).

[5] Colorado State Patrol Policy Number 4.03.0201 states that the transporting trooper is "legally responsible for the safety and custody of all persons transported in state-owned vehicles," and requires that detainees be restrained and transported in a manner that will reduce the likelihood of injury and death. The Policy instructs: an injured detainee may be handcuffed in front if their injury prevents them from being handcuffed behind the back; if the injury is

backseat of the patrol car for approximately thirty minutes before being driven to the Cortez Police Department.  (*See* Doc. #13 at p. 4; Doc #24 at p. 51, TR:54:4-12).

Proctor first drove Mickelson to the Police Department, which was one quarter mile from the arrest site.  Mickelson alleges that throughout the experience he complained approximately ten times about the pain caused by the handcuffs (*See* Doc. #24 at p. 49, TR:52:12-13).  Mickelson further alleges that when they reached the Police Department, Proctor responded to the complaints with, "[t]hat's my job," to which Plaintiff retorted, "[y]our job sucks."  (Doc. #24 at p. 50, TR:53:3-4).  Proctor then stated, "Okay, that does it. I'm not going to take you here to the police station for your test, I'm going to take you to the Sheriff's Office."  (Doc. #24 at p. 50, TR:53:9-11).  Mickelson alleges that he and Proctor then sat in the patrol car in front of the Police Department for five or ten minutes before Proctor drove Mickelson to the Sheriff's Office.  (*See* Doc. #24 at p. 55, TR:58:3-11).  Plaintiff alleges that during that time, he sat in the backseat of the patrol car crying due to the pain.  *Id.*  Proctor drove Mickelson another quarter mile to the Sheriff's Office, where they waited for approximately five minutes in the patrol car.  After entering the station, Proctor re-cuffed Mickelson's hands in front of him and Mickelson waited approximately thirty minutes on a bench before Proctor administered two breathalyzer tests.  Mickelson states that the pain in his left shoulder and back disappeared during this time.  (*See* Doc. #28-5 at pp. 17-18, TR:60:18-61:3, 61:20-63:2).  Both tests demonstrated that Plaintiff had a blood alcohol content of .008, well under the legal limit.  *See* C.R.S. § 42-4-1301(2)(a).  Proctor removed the handcuffs after the second test and drove Mickelson to retrieve his motorcycle without issuing a charge or ticket.

---

caused during a crash or the arrest and the detainee is not cleared by medical personnel on the scene, the person shall be transported to a hospital or medical facility for treatment; and, if a detainee claims to have an injury, the transporting trooper shall call medical to assess the detainee, document the incident, and accommodate reasonable requests.  (Doc. #24 at p. 14; Doc #24 at pp. 75-77).

Mickelson alleges he could "hardly move his arm" when he awoke the following morning, and the pain persisted after that. (Doc. #24 at p. 52, TR:55:2-5). Approximately one week after the incident Plaintiff traveled to Phoenix, Arizona to see his doctor at the Veterans Affairs Hospital and was treated by his doctor's assistant because he arrived without an appointment. The assistant advised that she would speak with the doctor about the reported pain, and Plaintiff received 800-miligram Tylenol in the mail from the VA two days later with instructions to take eight per day. (Doc. #24 at p. 5; p. 52, TR:55:3-25). Sometime in June 2012 Mickelson fainted, purportedly from ingesting too much Tylenol, and was transported to John C. Lincoln Hospital in Phoenix where doctors administered an MRI. Plaintiff learned from reading the MRI results that he had a full thickness tear of his left supraspinatus tendon. (Doc. #24 at p. 53, TR:1-11, 75:7-15). In January 2014, Mickelson visited Dr. Jennifer Forrest, an orthopedic surgeon in Durango, Colorado, and learned that he had waited too long to repair the tear. (Doc. #24 at p. 64, TR:74:25-75:6; Doc. #28-5 at p. 22). Plaintiff suffers from persistent pain in his left exterior shoulder, which wakes him four to five times per night. (*See* Doc. #24 at p. 74, TR:1-8, 18-23). He has also lost approximately twenty pounds of muscle and his "left side" has atrophied from lack of use. *Id.*

On June 7, 2014, Plaintiff attempted to report his injury and lodge a complaint with Proctor and Ozanic's supervisor, "John Doe 2," at the Durango office of the Colorado State Patrol ("CSP"). (Doc. #28-5 at p. 19, TR:69:1-16). Plaintiff claims John Doe 2 refused to lodge the complaint or report the injury, stating that he had reviewed the incident and believed that Proctor and Ozanic had acted in accordance with CSP policies and procedures. (*See* Doc. #13 at pp. 5-6; Doc. #28-5 at p. 20, TR:70:10-71:2, 72:4-7, 72:25-73:5). In his Response to Defendant's Motion to Dismiss, Plaintiff identified Captain Martin Petrik as John Doe 2. As is

the case with Ozanic, Plaintiff did not seek leave of court to substitute Petrik as John Doe 2. Petrik has not been served and is not before this court.

## PROCEDURAL HISTORY

Defendant Proctor waived service on June 13, 2013 and CSP waived service on June 21, 2013. (Doc. #5 and #7). On August 23, 2013, Plaintiff filed a Motion for Entry of Default (doc. #10). The Clerk declined to enter default because Plaintiff's Motion did not include the Fed. R. Civ. P. 55 affidavit. (Doc. #11). This court held a Preliminary Scheduling Conference on August 26, 2013, during which the undersigned explained to Plaintiff the necessity of pleading specific statements of facts rather than conclusions of fact, and the parties discussed Plaintiff's Motion for Entry of Default. (Doc. #12). On September 6, 2013, Plaintiff filed an Amended Complaint narrowing his claims to violations of the Fourth and Fourteenth Amendments and omitting CSP from the lawsuit. (Doc. #13). Defendant Proctor filed an Answer to the Amended Complaint on September 20, 2013 (doc. #15).

This court held a Scheduling Conference on October 28, 2013, at which Plaintiff proposed filing a Second Amended Complaint and requested 120 days to complete discovery, and the undersigned entered dates for the completion of discovery, filing of dispositive motions, and a Final Pretrial Conference. (Doc. #17).

Defendant Proctor filed a Motion to Dismiss on April 4, 2014 (doc. #21). Plaintiff filed his Response to Defendant's Motion to Dismiss on May 6, 2014, in which he included material outside of the pleadings and asked the court to convert Defendant's Motion to Dismiss into a Motion for Summary Judgment (doc. #24). Defendant filed a Reply in support of his Motion to Dismiss on May 20, 2014 (doc. #25). This court held a Status Conference in lieu of a Final Pretrial Conference on July 24, 2014, at which the undersigned converted Defendant's Motion to

Dismiss into a Motion for Summary Judgment and directed Defendant to file supplemental briefing by August 25, 2014. (Doc. #27). Defendant filed his supplemental brief on time (doc. #28), and Plaintiff filed a response on September 24, 2014 (doc. #29).

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th

Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including … summary judgment proceedings." *Id.* at n.3 (citations omitted). The *Haines* rule also instructs that a *pro se* litigant's complaint be "liberally construed to raise the strongest claims the allegations suggest." *Magassouba v. Cross*, No. 08 Civ. 4560(RJH)(HBP), 2010 WL 1047662, at *5 (S.D.N.Y. March 1, 2010) (internal citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). "Although [o]ur summary judgment standard requires us to view the facts in the light most favorable to the non-moving party[,] it does not require us to make unreasonable inferences in favor of the non-moving party." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs,* 117 Fed. App'x. 64, 69 (10th Cir. 2004)).

## ANALYSIS

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of his or her federal rights against a person acting under color of state law. *See* 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988). Mr. Mickelson claims that Officer Proctor unlawfully stopped, detained, and arrested him and used excessive force in violation of the Fourth and Fourteenth Amendments. Plaintiff further claims that Defendant Proctor and Sergeant Ozanic conspired to violate his constitutional rights, and that Captain Petrik is liable as supervisor for Proctor's constitutional violations.

### A.    Qualified Immunity

Plaintiff sued Defendant Proctor in his individual capacity. (*See* Doc. #24 at p. 6). Proctor argues he is entitled to qualified immunity, which "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their

conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted).   Qualified immunity is an affirmative defense to § 1983 liability (*see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995)); once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation." *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255).   The inquiring court may decide which prong to consider first in light of the circumstances of the case at hand.   *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).   Proctor argues that Plaintiff cannot satisfy either of the two prongs.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Saucier v. Katz,* 533 U.S. 194, 202 (2001).   Additionally, a right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" holds such a right to exist. *Medina v. City & County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992).   For the reasons addressed below, this court finds that at this stage in the litigation, Proctor is entitled to qualified immunity as to the conspiracy claim only.

**B.**    **Constitutional Claims**

1.    Fourth Amendment Protection Against an Unlawful Stop and Detainment

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and "its protections extend to brief investigatory stops of persons or vehicles that

fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-810 (1996). Brief investigative stops are permissible under the Fourth Amendment "when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cortez,* 449 U.S. 411, 417–418 (1981). Put another way, such a stop is justified if the officer has "reasonable suspicion" of criminal activity. *Alabama v. White*, 496 U.S. 325, 330 (1990). Whether suspicion is reasonable depends on "both the content of information possessed by police and its degree of reliability." *Id.* In reaching a determination regarding reasonable suspicion, courts must look at the "'totality of the circumstances' of each case." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 417). An officer's reliance on a mere "hunch" is insufficient to justify a stop. *See Terry v. Ohio*, 392 U.S. at 27. However, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion for an investigative stop can be based on information supplied by a person other than the officer making the stop (*see Adams v. Williams*, 407 U.S. 143, 147 (1972)), though "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *White*, 496 U.S. at 329. The law requiring an officer's reasonable suspicion of a traffic violation in advance of a traffic stop and reasonable suspicion of some other violation in advance of an investigative detainment has been clearly established for quite some

time.  *See, respectively*, *Terry*, 392 U.S. at 20-27, *and Lundstrom v. Romero*, 616 F.3d 1108, 1125 (10th Cir. 2010).

Proctor argues in his Motion for Summary Judgment that he was justified in conducting a traffic stop because Mickelson failed to signal a turn, and that he thereafter acted within the confines of the Fourth Amendment in detaining Mickelson for a drunk-driving investigation. Mickelson posits that an issue of material fact exists as to whether he signaled his left-hand turn, and that Defendant Proctor did not otherwise have reasonable suspicion to stop and detain him.

a.      *Reasonable Suspicion for the Traffic Stop*

Proctor attests that the Liquor Enforcement Officers, without specifying which one, contacted him and "advised of a male party they observed leaving the bar on a motorcycle and who appeared intoxicated."  (Doc. 28-1 at ¶ 3).  *See also* Proctor Arrest Report (Doc. #28-4) at p. 3 (stating that he was in the vicinity of the tavern when the Liquor Enforcement Officers "aired information about a male party [] leaving bar that appeared be intoxicated [sic].").  Sergeant Ozanic wrote in his supplemental narrative that "one of the Liquor Enforcement Officers advised [by phone] that a man was leaving [the bar] and was possibly intoxicated."  (Doc. #24 at p. 68). The Liquor Enforcement Officers provided no other information to corroborate their suspicion that Plaintiff was drunk.[6]

Proctor began tailing Mickelson after the Liquor Enforcement Officers' tip, and professes to have witnessed Mickelson fail to signal "either mechanically or by hand a left turn" (doc. #28-1 at ¶ 4).  Proctor provides no other basis for stopping Plaintiff.  Mickelson testified at his deposition that he was traveling at 30 miles per hour as he approached the four-way stop sign

---

[6] Mickelson claims he consumed a cocktail of cranberry juice and vodka upon arriving at the tavern at 8:00 p.m., and thereafter drank only glasses of cranberry juice until he left shortly after midnight.  (Doc. #24 at p. 2).  The Liquor Enforcement Officers did not, apparently, describe Plaintiff's drinking activity to Proctor and this court cannot assume the Officers even witnessed Plaintiff's beverage consumption, therefore mistaking the glasses of juice for alcoholic drinks.

and that he pointed with his left index finger at a 45-degree angle for one second before replacing his left hand on the bike's throttle and completing the stop. (*See* Doc. #24 at p. 31, TR:33:1-25). Colorado law requires that a signal of intention to turn right or left "be given continuously during not less than the last one hundred feet traveled by the vehicle before turning…" Colo.Rev.Stat. § 42-4-903(2). "All signals required to be given by hand and arm shall be given from the left side of the vehicle," and hand signals indicating a left-turn should be given by extending the left hand and arm horizontally. Colo.Rev.Stat. § 42-4-609(1). Failure to follow this provision constitutes a class A traffic infraction. *See* Colo.Rev.Stat. § 42-4-609(2).

Plaintiff attests in an affidavit that he "rode about 100 feet while [his] arm was extended making the signal; and, judging from [his] mirror, the car behind [him] was about 200 yards away." (Mickelson Affidavit (Doc. #29-1) at ¶ 5). Plaintiff claims that at 30 miles per hour, he travels 100 feet on his motorcycle in 2.1 seconds, and therefore "it is reasonable that a 'quick' turn signal would suffice to satisfy Colorado's traffic law." (Doc. #29 at p. 4). Plaintiff does not dispute that he indicated his left-turn by signaling at an angle rather than with a horizontally extended arm; however, Proctor does not cite that infraction as the basis for the traffic stop.

"The principal components of a determination of reasonable suspicion … will be the events which occurred leading up to the stop …, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *See Ornelas v. United States*, 517 U.S. 690, 696 (1996). The only facts before the court are those recited above: an unidentified liquor officer's suggestion that Plaintiff appeared intoxicated (which is an observation Proctor could have made himself, and did not, as he "personally observed" Mickelson's motorcycle leave the bar (Doc. #28-1 at ¶ 4)), and the disputed fact of whether Mickelson violated a traffic law by failing to properly signal. The

Liquor Enforcement Officers' suspicion appears little more than a hunch. *See Terry*, 392 U.S. at 21-22 (directing courts to question whether "the facts available to the officer at the moment of the seizure … warrant a man of reasonable caution in the belief that the action taken was appropriate"; and holding that "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches.") (internal quotation marks and citations omitted). *Cf. Navarette v. California*, 134 S. Ct. 1683, 1691 (2014) (Scalia, J., dissenting) (determining that a reliable tip alleging reckless and erratic driving consistent with conduct of a drunk motorist generally would justify a traffic stop on suspicion of drunk driving). Here, the Officers' advisement was offered without supporting facts, such as that one had observed Mickelson stumble in the bar or speak at an inappropriately loud volume. Nor, apparently, did the Officers confirm their suspicion by inquiring with the bartender as to the alcoholic nature of the drinks Mickelson had ordered, or interacting with Mickelson to gauge his level of intoxication.

Therefore, to justify stopping the motorcycle, Proctor needed to witness Mickelson engage in a traffic violation or similarly prohibited conduct. In light of the conflicting accounts regarding whether Plaintiff signaled his intention to turn as he approached the stop sign, I find that a genuine issue of material fact exists as to whether Proctor was justified in stopping Plaintiff for reasonable suspicion of a traffic violation.

b.      *Reasonable Suspicion for the Detainment*

Defendant Proctor states that after haling Mickelson, he approached him on foot and "immediately detected a moderate odor of an unknown alcoholic beverage on [Mickelson's] breath and his eyes appeared to be bloodshot and watery and his speech was slow." (Doc. #28-1 at ¶ 5; Colorado State Patrol Impairment Examination Report (Doc. #28-2) at p. 2). Proctor also

14

claims that Mickelson admitted to consuming "four drinks earlier." (Doc. #28-1 at ¶ 5; Doc. #28-2 at p. 3). These observations caused Proctor to ask Plaintiff to consent to voluntary roadside maneuvers. (Doc. #28-1 at ¶ 7). Proctor claims Mickelson was "unsteady" on his feet as he "exited his vehicle," prompting him to ask if Mickelson was disabled in any way that would interfere with his ability to perform the field sobriety test. (Doc. #28-1 at ¶ 7; Doc. #28-2 at p. 2). Proctor recalls that Mickelson answered in the negative. (Doc. #28-1 at ¶ 7).

Mickelson challenges part of Proctor's recollection. He claims he did not tell Proctor that he had consumed four beverages, and speculates that a Liquor Enforcement Officer reported that information to Proctor after observing Plaintiff consume four glasses of cranberry juice. (*See* Doc. #29 at pp. 6-7 n.2). Mickelson also submitted the affidavits of Sharon Williams and Tammi Williams as evidence that within five minutes of the traffic stop his breath did not smell of alcohol and his eyes were clear. (Sharon Williams Affidavit (Doc. #29-3) at ¶ 4; Tammi Williams Affidavit (Doc. #29-4) at ¶ 4). Mickelson alleges he told Proctor in Ozanic's presence that his only disability was being "old and hard of hearing." (Doc. #24 at p. 4). Finally, Plaintiff attests that Proctor ordered him to complete the roadside maneuvers and he was not told they were voluntary. (Doc. #29-1 at ¶ 11).

A police officer must have reasonable suspicion to subject a driver to a field sobriety test. *Wilder v. Turner,* 490 F.3d 810, 815 (10th Cir. 2007). A reasonable suspicion analysis is based upon the "totality of the circumstances," and "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu,* 534 U.S. at 273. Detection of alcohol on a driver's breath during a routine traffic stop typically gives rise to reasonable suspicion of drunk driving. *See United States v. Neumann,* 183 F.3d 753, 756 (8th Cir. 1999).

Furthermore, "[there is a] significant public interest in preventing a motorist whom an officer reasonably believes may be intoxicated from continuing to drive, and ... further detention for a field sobriety test is a minimal intrusion on an already stopped individual's privacy." *Kinberg v. District of Columbia*, No. Civ.A. 94-2516 (PLF, 1998 WL 10364, *8 (D.D.C.1998).

The Tenth Circuit has found, along with the Eighth and Eleventh Circuits and several district courts, reasonable suspicion exists to conduct field sobriety tests where the detainee admitted to earlier consuming an alcoholic drink and was observed with watery or bloodshot eyes. *See Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) (collecting cases). However, in *Vondrak* and the cases it cites, the drivers either admitted to the detaining officer that they had earlier consumed an alcoholic drink, or the interior of the stopped vehicle indisputably smelled of alcohol due to an intoxicated passenger.

With one exception, Plaintiff supplied an evidentiary challenge to each of Defendant Proctor's reasons for conducting the field sobriety test. The exception is Plaintiff does not contest Proctor's observation that he was unsteady on his feet. However, Mickelson was 67 years old at the time of the incident and he had just dismounted a motorcycle.[7] Significantly, Plaintiff disputes that his breath smelled of alcohol, that his eyes were bloodshot and watery, and that he admitted to consuming an alcoholic beverage. While recognizing that the Supreme Court has cautioned against second-guessing an officer's reasonable suspicion of drunk driving on the basis that law enforcement "need not rule out the possibility of innocent conduct" in order for reasonable suspicion to exist (*Arvizu*, 534 U.S. at 277), I find the conflicting record gives rise to

---

[7] Plaintiff testified during his deposition that he had complete control of the motorcycle after he pulled to the side of the road following Proctor's activation of emergency lights, though conceded that the vehicle is "very difficult to operate because it has a foot clutch," preventing the rider from placing his left foot on the ground upon slowing to a stop. (Doc. #24 at p. 39, TR:42:7-11). Plaintiff also testified that because of the foot clutch, "it's a little tricky to come to a real smooth stop sometimes, and I was a little nervous with the patrol car behind me. So I probably dragged my foot a little bit coming to the stop." (*Id.*, TR:42:17-20).

a genuine issue of material fact as to whether Proctor had reasonable suspicion to detain Mickelson to administer the field sobriety tests.

      2.    <u>Fourth Amendment Protection Against an Unlawful Arrest</u>

Defendant Proctor executed a warrantless arrest of Plaintiff Mickelson, and Mickelson disputes that probable cause existed to support the arrest. A warrantless arrest does not violate the Fourth Amendment if the arrest is supported by probable cause. *See Fogarty v. Gallegos*, 523 3d 1147, 1156 (10th Cir. 2008). Probable cause exists if, under the totality of the circumstances, the police officer "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Vazquez–Pulido,* 155 F.3d 1213, 1216 (10th Cir. 1998). The Tenth Circuit measures probable cause "against an objective standard and evaluate[s] it in relation to the circumstances as they would appear to a prudent, cautious and trained police officer." *United States v. Sparks*, 291 F.3d 683, 688-89 (10th Cir. 2002). Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity … therefore, innocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, 462 U.S. at 243 n. 13. Whether the arrestee is later charged with a crime is irrelevant to the probable cause analysis. *See Fogarty*, 523 F.3d at 1156 (citing *Devenpeck v. Alford,* 543 U.S. 146, 152–53 (2004)).

The question here is whether Mickelson's performance during the field sobriety tests, "as viewed objectively and in the light most favorable to [Mickelson], could establish probable cause to believe" Mickelson was driving while intoxicated. *Fogarty*, 523 F.3d at 1156. Proctor administered four field sobriety tests: Horizontal Gaze Nystagmus, which follows the detainee's eye movement; "One Leg Stand"; "Walk and Turn"; and counting backwards. (Doc. #28-2 at p.

2).   Proctor submitted a CSP Impairment Examination Report dated May 18, 2012, demonstrating that he had recorded satisfactory results of Nystagmus, but had determined that Plaintiff failed the "One Leg Stand" because he swayed and raised his arms.  *Id.*  Proctor also concluded that Plaintiff failed the "Walk and Turn" because he removed his foot from the line, did not consistently walk heel to toe, stopped walking at one point, and raised his arms.  *Id.*  Finally, Proctor found that Mickelson failed the counting test because he counted backwards from 57 to 47 when the instruction had been to count backwards from 57 to 43.  *Id.*

Mickelson testified at his deposition that he informed Proctor prior to the field sobriety tests that "I'm old, and I don't hear well, and I [don't] have my hearing aids," and that Proctor cited only Plaintiff's failure to count backwards to the correct number as the basis for placing him under arrest for suspicion of DUI.  (Doc. #29 at p. 8; Doc. #24 at p. 37, TR:40:18-25).  Mickelson also testified that he believed he had passed the tests and that he failed the counting test only because he misheard Proctor's instruction.  (Doc. #24 at pp. 37-38, TR:40:24-41:1).

An officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe the individual has committed even a very minor criminal offense in the officer's presence.  *Atwater v. Lago Vista*, 532 U.S. 318, 340, 354 (2001) (determining that warrantless arrest for misdemeanors is not restricted to instances of "breach of the peace," and arrest of motorist who was not wearing a seatbelt and who had not secured her children with seatbelts in contravention of state law did not violate her Fourth Amendment rights).   An individual's failure of three field sobriety tests typically gives an officer probable cause to arrest that individual for driving under the influence.  *See Vondrak*, 535 F.3d at 1203.  Mickelson advised Proctor that he was hard of hearing, which arguably should have impacted Proctor's

analysis of Plaintiff's counting performance.  However, Plaintiff did not refute any of Proctor's observations regarding the roadside maneuvers.

       3.     <u>Fourth Amendment Protection Against Use of Excessive Force</u>

Mickelson has a "physiological condition" that prevented him from touching his hands together behind his back, and alleges that Proctor "violently jerked" his left arm back to force his hands together, causing a full thickness tear of his left supraspinatus tendon.  (Doc. #13 at p. 4).  Mickelson also claims that Proctor ignored repeated requests to position the cuffs in front of his body to alleviate the pain caused by the tear, and prolonged without justification the time between handcuffing Plaintiff and administering the breathalyzer tests.

Proctor attests that upon arrest, he told Mickelson "to put his hands behind his back," and followed CSP handcuffing procedures in assuring the bracelets were "not too tight" before double locking them.  (Doc. #28-1 at ¶ 10).  Proctor states that Mickelson did not complain about the handcuffs or otherwise express discomfort, and was cooperative when Proctor drove him to the Cortez Police Department, "one or two minutes away from the site of the arrest."  (*Id.* at ¶¶ 10-11).  Proctor further attests that Mickelson "became verbally upset about getting arrested as I pulled into the Cortez Police Department … [and] I decided for my safety to go to the [Sheriff's Office] instead, a more secure environment, which was a block from the Cortez Police Department."  (*Id.* at ¶ 12).  It is undisputed that after arriving at the Sheriff's Office, Proctor removed the handcuffs from behind Plaintiff and replaced the handcuffs in the front of Plaintiff's body.  Proctor removed the handcuffs entirely after Mickelson passed the breathalyzer tests.  (*Id.* at ¶ 13).[8]

---

[8] Proctor submitted a Colorado State Patrol Incident Recall Record that was generated during the stop, detainment, and arrest of Mickelson, which he argues demonstrates that seventeen minutes elapsed between the traffic stop and when Proctor removed the handcuffs.  (Doc. #28-1 at ¶ 15; Doc. #28-3).  This court is unable to confirm the amount

Claims that excessive force was used during the arrest of an individual are analyzed under the Fourth Amendment's "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment guarantees citizens the right "to be secure in their persons … against unreasonable … seizures" of the person, and the reasonableness of a seizure depends on when it was made and on how it was carried out. *Id.* at 394-95. Specifically, the court should consider the severity of the crime at issue, whether the arrestee posed an immediate threat to the safety of the officers, and whether he was actively resisting arrest or attempting to flee. *Id.* at 396 (citing *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985)). An officer's violation of the *Graham* reasonableness test "is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007) (quoting *Holland ex. rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001)). "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey*, 509 F.3d at 1285. "Whether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder." *Quezada v. County of Bernalillo*, 944 F.2d 710, 715 (10th Cir. 1991) (collecting cases), *overruled on other grounds by Saucier,* 533 U.S. 194.

Plaintiff was arrested for a misdemeanor. At the time of the arrest, he was 67 years old, unarmed, and non-combative. Nothing in the record suggests that he was perceived as a flight risk. Therefore, all three of the *Graham* factors weigh in Plaintiff's favor. However, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof

---

of time that Mickelson was handcuffed from the Incident Recall Record and thus declines to consider the record for the purposes of this Recommendation.

to effect it."  *Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir. 1991) (citing *Terry*, 392 U.S. at

22–27).  Mickelson was unaware at the time of his arrest that his hands could not touch behind

his back.  He realized this limitation as he attempted to comply with Proctor's instructions.

Mickelson did not warn or otherwise alert Proctor to his condition prior to Proctor forcing his

arms together.  (*See* Doc. #24 at p. 46, TR:5-25).  "Not every push or shove, even if it may later

seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."

*Graham*, 490 U.S. at 396.

Plaintiff also alleges that Proctor ignored his repeated statements of pain and requests to

reposition the handcuffs.  "The *Graham* factors are less helpful in evaluating the *degree* of force

applied in cases … where the handcuffing is permissible yet the *manner* of handcuffing may

render the application of force excessive."  *Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th

Cir. 2009).  Handcuffing in connection with an arrest is not necessarily an excessive use of force;

therefore, to demonstrate a constitutional violation, a plaintiff must show an actual injury

sustained in the course of the officer applying handcuffs.  *See id.*  Several circuits have held that

painful handcuffing alone does not constitute excessive force where the resulting injury is

minimal.  *See Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) (collecting cases).

And, where the resulting injury is significant, the courts must consider whether the arresting

officer knew the handcuffs were causing or contributing to an injury.  *See Fisher*, 584 F.3d at

896.  "What would ordinarily be considered reasonable force does not become excessive force

when the force aggravates (however severely) a pre-existing condition the extent of which was

unknown to the officer at the time."  *Rodriguez*, 280 F.3d at 1353 (determining the arresting

officer had not used excessive force in applying handcuffs, despite the fact the arrestee's arm

was subsequently amputated as a result, because the arrestee had not alerted the officer to his preexisting injury.).

Mickelson claims he suffered an irreparable full thickness tear of his left supraspinatus tendon as a result of the handcuffing, and that he endures daily pain that prevents him from exercising and sleeping through the night.  (Doc. #24 at p. 63, TR:18-23).  Mickelson learned of the tear by reading results of an MRI administered in June 2012.  (Doc. #28-5 at p. 21, TR:75:7-15, 76:1-6).  Mickelson also testified that an orthopedic surgeon he visited in January 2014 determined the tear was irreparable because Mickelson had "waited too long" to treat it.  (Doc. #24 at pp. 63-64, TR:74:25-75:6).  Defendant Proctor does not address the question of a causal link between the handcuffing and the injury; he argues only that he is entitled to qualified immunity on the question of excessive force.  I find a genuine question of material fact exists as to whether the tendon tear was a result of the handcuffing.

Proctor does not dispute that an irreparable full thickness tear of the left supraspinatus tendon is significant.  Therefore, if the injury can be linked to the handcuffing, the second question is whether Proctor knew the handcuffs were contributing to or exacerbating the tear.  Mickelson testified to crying in the backseat of the patrol car and asking no less than ten times to be handcuffed in front.  (*See* Doc. #24 at pp. 49, 55, TR:52:12-13, 58:3-11).  Proctor claims he was unaware that Mickelson was injured, in pain, or even uncomfortable as a result of having his hands cuffed behind him.  If Proctor knew Plaintiff was injured, he may have violated Plaintiff's Fourth Amendment rights by refusing to re-cuff Plaintiff's hands in front of his body.  *See Fisher*, 584 F.3d at 896 (recognizing as salient distinctions that arresting officer had no knowledge of plaintiff's injuries and had not handcuffed plaintiff in front of his body).  *See also Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (finding a plaintiff could not support

excessive force claim where the plaintiff failed to complain to the officers that the handcuffing causes her pain).[9]   Accordingly, I find a corresponding genuine issue of material fact exists as to whether Proctor knew Plaintiff was injured.

## C.   Remaining Claims

1.   Conspiracy

Plaintiff Mickelson claims that Defendant Proctor and Sergeant Ozanic conspired to violate his constitutional rights by working together on the evening of May 18, 2012 to stop and detain him after he left the tavern.   Defendant Proctor argues that merely alleging that two or more troopers patrolled an area together and detained an individual is insufficient to establish the elements of a conspiracy.

A federal conspiracy action brought under § 1983 requires "a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010) (citing *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir. 1990)).   The "plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 533 (10th Cir. 1998) (internal quotation marks and citation omitted).   First, there exists a factual dispute as to whether Proctor violated Plaintiff's constitutional rights.   Second, even if the salient facts were undisputed, Plaintiff has not alleged that Proctor and Ozanic reached an agreement amongst themselves or with the Liquor Enforcement Officers to deprive him of his constitutional rights.   Indeed, Plaintiff has alleged little more than Proctor and Ozanic were a part of the same task force on the evening of May 18, 2012, received information from the Liquor Enforcement Officers that Plaintiff "appeared

---

[9] Additionally, Colorado State Patrol Policy Number 4.03.0201 required Proctor to reposition the handcuffs in the front of Paintiff's body if he knew Plaintiff was injured.

intoxicated," and that Ozanic appeared at the scene of the traffic stop after instructing Proctor to tail Plaintiff.   An allegation of "[p]arallel action—or inaction ...—does not necessarily indicate an agreement to act in concert." *Brooks*, 614 F.3d at 1228 (quoting *Salehpoor v. Shahinpoor*, 358 F.3d 782, 785, 789 (10th Cir. 2004)).   There is no evidence of a meeting of the minds or agreement to violate Mickelson's constitutional rights.   I find that Plaintiff's conspiracy claim should be dismissed without prejudice.

2.   Supervisor Liability

Finally, Plaintiff Mickelson claims that Captain Petrik refused to accept a complaint against Defendant Proctor or Sergeant Ozanic based on Mickelson's allegations of constitutional violations and attempted to dissuade him from pursuing legal redress for those violations. Plaintiff further claims that Captain Petrik "condoned, ratified and approved" Proctor's actions by failing to lodge the complaint, thereby subjecting himself to supervisor liability.   (Doc. #13 at p. 6).   Plaintiff conceded in his Supplemental Brief that to the extent this claim is asserted under Colorado State law, he has not filed a Notice of Claim as required by the Colorado Governmental Immunity Act, Colo.Rev.Stat. § 24-10-109(1).   (*See* doc. #29 at p. 13).   However, Petrik is not a party to this action.   This court has no jurisdiction over him and cannot enter a judgment against him.   *See Mitchell*, 80 F.3d at 1441.

To the extent John Doe 2 is a party to this action, the question of supervisor liability is sufficiently intertwined with Plaintiff's constitutional claims as to preclude disposing of it on a motion for summary judgment.   This circuit's standard for supervisor liability under § 1983 requires "allegations of personal direction or of actual knowledge and acquiescence." *Woodward v. Worland*, 977 F.2d 1392, 1399-1400 (10th Cir. 1992) (Holding negligence and gross negligence do not give rise to section 1983 liability).   This standard has also been

articulated as a three-prong requirement: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). This limited formulation came into question following the Supreme Court's discussion in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), rejecting the argument that a "supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 677. The Court instructed that in "a § 1983 suit…-where masters do not answer for the torts of their servants-the term 'supervisor liability' is a misnomer," and "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* Thus, the Court held, when a plaintiff sues an official under § 1983 for conduct "'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds*, 614 F.3d at 1198 (quoting *Iqbal*, 556 U.S. at 677).

Mickelson alleges that he contacted the "supervisor for the patrolmen" at the CSP office in Durango, and attempted to complain over the telephone about the incidents of May 19, 2012. (Doc. #28-5 at p. 19, TR:69:1-8). Plaintiff testified at his deposition that "it was obvious the [supervisor] was going to go into defending his officers and not really take the complaint seriously," because when he accessed the incident report he stated, "I don't know what you're complaining about. It shows on here you had a .8 alcohol level. You were way drunk." (Doc. #28-5 at p. 20, TR:70:10-23). Mickelson testified that the supervisor became argumentative when Mickelson attempted to correct him. "[The supervisor] asked me if I would send him a complaint in writing, which I declined to do because I could see that he was just going to use whatever information I gave him against me, so…" (Doc. #28-5 at p. 20, TR:70:25-71:5).

Plaintiff admitted that the supervisor did not verbally suggest that he forgo pursuing the complaint (*see* Doc. #28-5 at p. 20, TR:73:16-21), and Plaintiff did not submit a written complaint.

## CONCLUSION

To the extent I find that several genuine issues of material fact exist as to Plaintiff's constitutional claims, this court RECOMMENDS that Defendants' Motion for Summary Judgment (doc. #21) be DENIED as to the claims for unlawful stop and detainment, arrest, use of excessive force, and supervisor liability.  This court RECOMMENDS that the Motion for Summary Judgment be GRANTED as to the claim for conspiracy.

### Advisement to the Parties

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 9th day of December, 2014.

BY THE COURT:

s/Craig B. Shaffer
United States Magistrate Judge